Well, good morning, ladies and gentlemen. We're glad to have you with us. And we'll start with Mr. Smith. Good morning, Your Honors. And may it please the Court, Christopher Smith for the United States. And with the Court's permission, I'd like to reserve eight minutes for rebuttal. Thank you, Your Honor. Your Honors, after a week-long evidentiary hearing, the District Court in the Southern District of Texas found that Alfred Bourgeois is not intellectually disabled and denied his 2255 motion in a 200-page opinion. Bourgeois did not appeal that court's finding, and he cannot use Section 2241 to relitigate that issue a decade later on the eve of his execution. Bourgeois' claim cannot pass through the Saving Clause. It is an abuse of the writ, and the District Court was wrong to let it advance on a waiver theory. The District Court was also wrong when it found that Bourgeois has a likelihood of success on the merits of his claim. It therefore abused its discretion in granting a stay of execution. Unless this Court prefers otherwise, I plan to begin with the Saving Clause issue and then move to the waiver issue. Well, I would, other judges, I may have a feeling about it, but I wouldn't spend too much time on it, but go ahead. Your Honor, as this Court well knows, Section 22, 2255E, the Savings Clause, prohibits a habeas petitioner from proceeding under Section 2241, absent of showing that Section 2255 is inadequate or ineffective to test the legality of his detention. I think the key cases here, as we laid out in our opening brief, that the trio of Davenport, Garza, and Webster are all informative, but I think particularly informative are these, this Court's two most recent cases in Lee and Perkey. In those cases, this Court confronted a habeas petitioner that was, that was attempting to proceed under Section 2241 in a capital case, just as Mr. Bourgeois is. And this Court concluded that, quote, to quote from both of those cases, there must be a compelling showing that as a practical matter, it would be impossible to use Section 2255 to cure a fundamental problem. Now, the fundamental problem here that Mr. Bourgeois presents is an intellectual disability claim, just like in Perkey and Lee, the fundamental problem that was presented was an ineffective assistance of counsel claim. And it's impossible to show that Section 2255 is inadequate to address that claim when Mr. Bourgeois actually did raise that claim and litigate it extensively in his 2255 motion. And as this Court made clear in Perkey and Lee, it is not enough to show that the proper use of the statute results in a denial of relief. Mr. Bourgeois, the core of his argument in this case on the merits is simply that the District Court in the Southern District of Texas, in essence, got it wrong. And that's not enough to trigger the savings clause under this Court's most recent cases, and also under the Davenport Standard, Webster, and Garza, all of which were litigators. That's right, of course. But I understood the defendant's argument, the petitioner's argument to be a little different, not simply that the Southern District of Texas was wrong, but that there had been intervening developments in the law and in the diagnosis of intellectual disability that he wants to and believes he should be able to take advantage of. Could you address that aspect of the case? Your Honor, I think I'd make three points with respect to that aspect of the case. The first is that even taking into account the newest diagnostic manuals on intellectual disability, the District Court's conclusion in the Southern District of Texas was sound. And putting that out there is an initial matter. Secondly, if you view diagnostic manuals as the equivalent of new evidence, which I'm not entirely sure that that's precisely an argument that Mr. Bourgeois advances, but is perhaps the best box to fix this in or to fit this in, I think the Webster Standard at that point comes into play. And this Court was pretty clear in Webster that only very narrow types of new evidence would be enough to trigger the savings clause. Specifically, the Court said that that's newly discovered evidence that existed at the time of trial and was unavailable despite the diligence of defense counsel. And here he can't meet that standard because the District Court did employ the contemporary standards that were fall within the Webster Standard. And I would just note, Your Honor, that in Webster, even though this Court allowed that claim to proceed, it did so while recognizing that there were very serious finality concerns that were in play. And it made an effort to narrowly tailor that holding. And here, if the Court were to accept Mr. Bourgeois' argument and depart from Lee and Perkey and Webster and this line of cases, I don't think it's hyperbolic to say that it would, in effect, eviscerate finality in federal capital cases because just one look at the petitioner's appendix indicates that there are frequently articles and minor tweaks and updates to the diagnostic manuals that are published. And there's every possibility that if the District Court were to proceed with the 2241 action, adjudicate that, that the day after that happens, or the day after this Court's decision, that there could not be a tweak to an additional manual. And would that trigger another 2241? I think the answer to that payment has to be no for all the same reasons that it should in this case. Mr. Smith, what's the government's position on whether or not there is a difference between the diagnostic standards, between DSM-IV and DSM-V? There didn't seem to be a lot in the record on that. Your Honor, I believe that the DSM-V is in petitioner's appendix, if this Court wishes to view it in the government's position. It is, but comparing it to DSM-IV, what's the government's position if there really is a significant difference when it comes to evaluating intellectual disability under that? In our view, Your Honor, there's not. And I would point out that these are the same manuals that the Supreme Court has relied upon. I believe DSM-IV has been discussed in Supreme Court cases. And AAIDD 11, the 11th edition of the AAIDD, which is what the Supreme Court discussed in Moore, there may have been some different verbiage used in these manuals, but as it affects the district court's analysis below, there truly is no difference. I think what the Supreme Court was getting at in Moore is that the Texas Court of Criminal Appeals disregarded the current clinical standards at the time of that adjudication and embarked on its own application of the factors. And here, that's, in effect, the opposite of what the district court did. In its 200-page opinion, it is clear that the district court is both cognizant of the applicable standards, including the AAIDD 11th edition, which remains in that system, the current diagnostic manual, and that it faithfully applied those standards based upon clinical psychological evidence. The issue that the district court confronted... Excuse me. While we're on that subject, I guess one of the things that I found striking in reading Judge Jack's opinion, obviously, there are a lot of questions about exactly what our role is here. But when I was reading her opinion, I was struck by her differentiation between what she called the legal and the psychological standards for intellectual disability. And there's at least an argument to be made that both Atkins and certainly Moore try to bring together and prevent there being any real daylight between those. Could you address that aspect of the decision? Your Honor, I don't think that Judge Jack's opinion is truly any different than what the Supreme Court's. In page 722 of Hall, for example, the Supreme Court makes clear that the determination of intellectual disability, and I believe this is a direct quote, is informed by the views of medical experts. These views do not dictate the court's decision, yet the court does not disregard these informed assessments. And the court in Moore made clear that while states don't have unfettered discretion to a psychologist who has signed on the dotted line that there's an intellectual disability, the court actually has to engage in its role of evaluating expert testimony, just as it did here. I mean, the problem that the district court, Judge Jack, in Texas faced here is that you had a number of clinical psychologists who had examined Mr. Bourgeois, applied the So the district court did what, in my view at least, the district court is supposed to do in these instances. It examined that expert testimony, looked, for example, at Dr. Swanson and said, what are the inputs to Dr. Swanson's analysis and how do they affect the conclusion? And it found that Dr. Swanson had basically based her adaptive analysis primarily on a study administered to an individual who had observed Mr. Bourgeois in his youth only sporadically and said, well, that really affects the conclusion that Dr. Swanson had. By contrast, she looked at Drs. Moore and Price and their inputs to what they examined were of a nature that the district court, Judge Jack, in southern Texas found to be So I think when there's a discussion of the differentiation between a legal approach and a psychological approach, it doesn't mean, as the Supreme Court said in Moore, that a court is free to sort of throw out the psychological criteria. The decision must be informed by Bill Matkins itself makes that clear. What the legal approach is, is basically the district judge executing his or her duty as a district judge to evaluate the expert testimony, evaluate credibility, resolve the issues in play. And I think that that's exactly what Judge Jack did here. I mean, almost 100 pages of the analysis for that. Thank you. Could I go back, I guess, to the role of Moore in this? Mr. Bourgeois and his counsel called our attention in their brief to a couple of post-Moore decisions in the Fifth Circuit to allow subsequent or successive 2255 petitions based on Moore. I think those cases were called Cathy, C-A-T-H-E-Y, and Johnson. I didn't see those addressed in your reply brief, and I would be interested in your take on the significance the Fifth Circuit seemed to give Moore in those cases. Sure, Your Honor. I went and reread both of those cases last night. And I mean, the Fifth Circuit has an interesting point of view in those cases. And they basically hinge the ability to proceed in 2255 with Moore, recognizing that Moore is not retroactive, but finding that it made Atkins, which was retroactive, newly available. And I make two points about how those cases are different in one observation. I mean, the two points are those petitioners were slightly differently situated than Mr. Bourgeois because they never raised an Atkins claim initially. And the issue in those cases was their IQ scores and whether or not they had reached the cutoff. The observation that I would make is that Atkins itself was on the books, both at the time of the conviction sentencing the 2255 here. So I think any notion that allows a claim to proceed based on the retroactivity of a decision that predated the conviction, the sentence and the crime on the facts here just can't stand because that's a way to backdoor or to evade truly the Teague analysis on Moore. And I think it's the 11th Circuit held in Smith v. I think it's warden of the Alabama Department of Corrections. Moore does not provide a retroactive rule. And trying to escape that conclusion by hinging on the retroactivity of a decision that predated the conviction, I think would be a fairly strange notion and one that the government would certainly disagree with. Your Honor, the government's position, I think, is clearly laid out in the briefs on the savings clause and on the merits of the Southern District of Texas's decision. I would just turn for a moment to address waiver unless the court has another preference. One question. If we find that there wasn't waiver, why should we decide this in the first instance rather than remand it to the district court to make the determination? Well, Your Honor, I'd point to a couple reasons. First of all, in the government's view, the law on this matter is very clear. The inapplicability of the savings clause is very clear for all the reasons that we laid out in the briefs. And I think judicial economy counsels in favor of this court going ahead and deciding the clear issue. But there's also a very real timing concern here. As the Supreme Court has repeatedly and recently recognized, both the public and the victims of crime have an important interest in the timely implementation of a death sentence here. And this sentence has been stayed both in the execution protocol litigation for grounds that were ultimately determined to be meritless and in this court's due to the district court's decision in this case. And I think both the public interest and judicial economy would counsel in favor of this court expeditiously resolving this issue and lifting the stay as soon as possible and considering in an opinion, if the court does agree with the government's considered view, issuing the mandate forthwith at that point to allow the process to carry on. Should the government's delay in getting the protocol in place and scheduling the execution have any impact on our analysis? I don't think so, Your Honor. We briefly touched upon this in our briefs. And I I believe that there there's a Supreme Court opinion. I believe it was Justice Thomas's opinion that makes the point that I think that would have the perverse incentive of penalizing the government for engaging in a thoughtful and careful process with the development of the protocol litigation. I mean, in essence, it would be I'm sorry, with the development of the protocol, not the litigation. In essence, it would be penalizing the government for attempting to exercise its duties in a thoughtful, constitutional and lawful way and not rushing to for the execution to take place. So we would posit that that's not an apt consideration here. And to the extent that the district court relied upon that, that it it should not have done so. And if that was error. Your Honor is just briefly turning to the the waiver point. I would make a couple of points here, which I think are clear in our briefs. But I would just like to emphasize the first is that the government filed a almost 100 page response below, arguing both that Mr. Bourgeois's claim did not pass through the savings clause and that it was an abuse of the rent. It would be nonsensical to think that the government filed 100 page opposition, yet somehow intentionally allowed or wished Mr. Bourgeois's substantively identical statutory claim to proceed. There is nothing in the record that supports that notion. While we recognize in retrospect, it may have been better to be more explicit about some of our arguments. When the government referred to Mr. Bourgeois's Atkins claim, it referred to it in that terminology, because that was the terminology in many places that Mr. Bourgeois himself referred to as intellectual disability claim. The touchstone of waiver, as this court's made clear in cases like Garcia and others, is a knowing and intelligent decision to forego an argument. And there's nothing in the record that suggests the government did so here. The district court found the government's in its view, the government's waiver to be inexplicable. And I think that that's true and that indicates that the district court should not have found waiver because this court focuses on issues such as if there's a strategic reason for the waiver in determining whether or not a waiver was intentional. And here there plainly was not because Mr. Bourgeois and the district court have never posited a reason. Even if there's not intentional waiver, you obviously have this rather embarrassing oversight in the brief. And you're left in the realm of forfeiture, which at least as I read, for example, Wood against Milliard leaves a fair amount of discretion to the court. And to the extent that discretion belongs to the district judge here, on what grounds could we call that an abuse of discretion? Further and more generally, as you know, probably better than than I or perhaps my colleagues, the government is very often the party urging us to strictly enforce the procedural requirements of fair presentment in district courts, in the courts of appeals, et cetera, often to the detriment of habeas petitioners. And what we have here certainly has a kind of flavor of good for the goose, good for the gander, in evaluating this problem by the government's failure to address the Federal Death Penalty Act. Your Honor, your points are well taken. I obviously disagree with them and would take issue with the fact that we waived or forfeited. But taking that as the premise of Your Honor's question, I would look to cases. There's a line of Supreme Court cases. Wood v. Milliard is one of them. I'd also look to this court's case in Ford that was Judge Posner's opinion in Ford, where the government had not argued harmless error, yet the court applied it. And it did so in Ford for the same reasons why the Supreme Court did so in Wood and in other cases, that it found that it is necessary when interests of third parties are at stake. And here there are where the interests go beyond the interest of the parties in the case. And here that's plainly so. I mean, for example, in Ford, the interests that the court found at stake there were interest of litigants in the court system overburdening the courts. And in this case, it goes far beyond that. To your question about discretion, Your Honor, I would say, first, the district court didn't find forfeiture. It found waiver. And for all the reasons I just said, that is error. So it obviously abused its discretion there. Secondly, because it didn't find forfeiture and it found waiver, it did not even consider the factors that this court said would be appropriate in Ford and the Supreme Court said in other cases. And I think the failure to consider those factors is significant. And I think as this court made clear in Ford, it's appropriate for this court to now consider those factors. And I think when you're looking at a capital case that's been litigated for a decade where the claim has been in the government's view, and I think is a fair view, fully and authoritatively reviewed in a decision that was not appealed following a week long evidentiary hearing and a 200 page opinion. I think to reopen that question for the victims, for the public, evading the requirements that Congress has put into place, those are all interests that plainly go beyond the specific parties in this case and would counsel in favor of resolving the issue. You have seven minutes left. You want to get to the issue about satisfying the requirements for the case? Yes, Your Honor. And I would touch on Nick and V. Holder, the Nick and V. Holder requirements. The Supreme Court has made clear that there must be a strong showing of likelihood of success on the merits for all the reasons that we've discussed. There has not been one. Also, the public interest, the third and fourth factors merge from the government as a party here for all the reasons that we've stated. The Supreme Court has repeatedly and recently made clear that there is a strong public interest in the time and enforcement of a death sentence. And in the government's view, Mr. Bourgeois also delayed in bringing his claim. And, Your Honors, I would reserve the rest of my time for rebuttal. I'm happy to answer, certainly, any remaining questions that the court has. But if there are none, I'm happy to reserve the rest of my time. It doesn't appear there are any other questions. Thank you, Your Honor. Thank you. Mr. Williams? Yes, Your Honor. Peter Williams for Mr. Bourgeois, and may it please the Court. Your Honors, Alfred Bourgeois is intellectually disabled. And under the government's position, if the government's argument is accepted, then Mr. Bourgeois would be executed without any court ever evaluating his claim under current legal and diagnostic standards. If the government's argument is accepted, then it would be free to proceed on Mr. Bourgeois' execution, regardless of whether or not he's intellectually disabled. Now, clearly this can't be the case. The Federal Death Penalty Act, by its plain language, bans the carrying out of an execution on anyone who is, present tense, intellectually disabled. And Mr. Bourgeois meets this criteria. He is ID, under current legal and diagnostic standards. And the district court was correct. The issue was stay, so that Mr. Bourgeois could litigate the merits of his claim. Now, I'd like to cover three main areas today. One, that Mr. Bourgeois' FDPA claim is entitled to Savings Clause 50, and is entitled to 2241-50. Two, that the district court appropriately stayed his execution. And three, that the government has waived any objection to the FDPA claim. And if it pleases the court, I'd like to do it in that order. It just moves a bunch. So, to start with 2241 and cognizability, the starting point, I think, is simply the plain language of the Federal Death Penalty Act. And that it is, as I said, it imposes a categorical exemption on the carrying out of anyone who is, present tense, intellectually disabled. Under this court's precedent, a 2241 challenge is appropriate when you are challenging the execution or the carrying out of a sentence, as opposed to its imposition. And, in fact, that is really the only place where you can do that. There's no room in 2255 to challenge the carrying out of a sentence. 2255 focuses solely on the imposition. So, on those grounds alone, I don't think we have to move any further beyond that. Mr. Williams, given the problem that intellectual disability has to be manifest before age 18, as I understand the diagnostic standards, I have trouble accepting your argument. I see it as applied to a forward incompetence argument, which cannot be litigated earlier. But I have trouble seeing why an earlier finding that a person is not intellectually disabled doesn't carry forward, despite the focus on the present tense. Your Honor, I think the reason it doesn't carry forward in this case, and that's one of the many factors in this case that make it so exceptional and specific. The reason it doesn't carry forward in this case is that there have been two significant intervening events. The first being the issuance of More 1 and More 2, which are significant intervening legal developments. And the second being the issuance of the AAIDD's 2012 User's Guide and the American Psychiatric Association's DSM-5. And we've outlined in our papers all of the reasons that those things are significant. But to summarize More 1 in particular, there are two holdings that are particularly significant to this case. The first one is that More, in contrast to Hall, made current diagnostic standards binding in an intellectual disability proceeding in a capital case. And the second major holding that's significant here is that the Moore Court went on to reject a number of practices that courts across the country had employed in intellectual disability cases pre-Moore as contrary to that scientific standard, that current diagnostics. Mr. Williams, in your briefing, you argued that More 1 and More 2 have abrogated certain law. Certainly, they've addressed some of the Texas standards, state law standards that were applied, but what federal law have they abrogated? I don't cite it. I'm sorry. Okay, may I proceed? Yeah, please. Okay, sorry. My apologies. I think they've abrogated, well, they certainly have abrogated the analysis employed by the district court in Mr. Bourgeois' case. And they have also abrogated the Fifth Circuit precedent, indicating that the analysis employed by the district court in 2255 proceedings was okay. And that's the bind that Mr. Bourgeois finds himself in, is that the 2255 court engaged in a number of practices that More 1 and More 2 later rejected. The first thing that 2255 court did- But why would that be an abrogation of prior precedent, federal precedent, as opposed to just an extension or clarification of Adkins? Well, I mean, I think it's both in that it does clarify the standard that needs to be employed in an intellectual disability determination. But it also abrogates, constrains, undermines, whatever the- I don't want to get caught up on the specific word- overturns the Fifth Circuit precedent, indicating that contra-scientific practices were okay in an IV determination. So that's what More did to that Fifth Circuit precedent, that there was Fifth Circuit precedent that the district court relied on throughout its analysis. And that Fifth Circuit precedent permitted the embrace of a legal standard in contrast to a scientific or psychological standard. And that's just what the district court did in 2255 proceedings. That it said, here's the legal standard, and here is the psychological standard, and I, the 2255 court, am going to apply the legal standard. And under the Fifth Circuit precedent that was in place at that time, that was okay. That if Mr. Bourgeois had appealed that determination at that time, the binding Fifth Circuit precedent would have precluded relief for Mr. Bourgeois. More I changed that. More I said, you cannot employ this legal standard that is different than the scientific standard. That the scientific standard, the current diagnostic standards, form one constraint on the discretion of courts when making an ID determination. And the second way that More wanted to overturn that Fifth Circuit precedent and rejected the analysis employed by the district court in 2255 proceedings, is that there are a number of specific practices that More 1 said you can't do in an ID determination because they're contrary to the science. And those are laid out in detail in our brief. But, you know, an example, More 1 said you can't use stereotypes regarding the intellectually disabled. And it's cited to a list of erroneous stereotypes that was in the AIDB's 2012 User's Guide. More 1 says that you can't rely on strengths when making an ID determination. And also cited to the AIDB's diagnostic manuals, as well as the DSM-5. So there are additional examples that we lay out. But this is significant in this case because in addition to separating between the legal standard and the scientific standard, and then going with the legal standard, the 2255 court then went on to engage in each and every one of the practices that the More 1 and More 2 courts later rejected. Mr. Williams, when you talk about and criticize the district judge in Texas for going through the lay evidence, I assume you would agree that all that evidence is relevant on the theory that, at the very least, if the people who knew Mr. Bourgeois when he was growing up, who knew him before this awful crime was committed, had experienced him as someone who was intellectually disabled, surely that would be relevant and admissible for the defense, correct? Well, Your Honor, it depends on what that testimony would be. The opinion of a lay person. I'm not talking about just an overall opinion, but I'm talking about observations about what he was able to do in school, in graduating from high school, in working successfully as an over-the-road truck driver for many years all over the country, and so on. That if there were evidence that he could not do those things, the defense would be entitled to put it on, right? Yes, Your Honor. That evidence is admissible, but it's the analysis that's flawed. So it winds up, it has to be addressed, and then it winds up, it sounds to me, like just a question of kind of nuance and emphasis in how you write the opinion that differentiates between complying with more and violating more. Well, I don't think so, because the district court in the 20-55 proceedings made perfectly clear that she was rejecting the scientific standard. So this isn't a question of running it through the same appropriate analysis and coming out in different places, but in both prong one and prong two, the district court identified the difference between the quote-unquote legal standard and the quote-unquote psychological standard in indicating that it was following the legal standard. The second thing that I would say regarding two of the things that Your Honor referred to, for example, truck driving, the other error that's relevant to that, and there's several, and we list them in the brief, but another major error that's relevant to that is by saying that an individual is not ID because he or she can do something, that there's a certain strength that necessarily rules out intellectual disability. That's exactly what more one, the AIDD, and the DSM-5 say you're not supposed to do. You're not supposed to rely on a strength. That adaptive behavior is something that is assessed through the presence of weaknesses, not the absence of strength. It is assumed that there will be strengths that co-exist with the weaknesses, and what the district court did, and she did so explicitly in 2255 proceedings, is the district court said, I recognize that that's what the psychological standard is. I'm not going to do that, and the district court specifically referred to quote-unquote, and this is a close paraphrase, blunting the effect of deficits with the presence of strengths, and that's also, that's weight, and that is, again, one of those practices that the more one and more two courts said doing that is contrary to the scientific standards and unacceptable in an intellectual disability determination. Mr. Williams, you had the opportunity to raise all of these arguments before the Fifth Circuit when you asked for a successive petition. More one had come out by then. You cited more one in the successive petition, and the Fifth Circuit rejected that argument. Aren't you just asking us now really for a collateral attack on what the Fifth Circuit did there? Isn't that exactly what we're not supposed to do? And, Your Honor, I don't think that's what we're asking you to do because what the Fifth Circuit found was it found because Mr. Bourgeois litigated an ID claim earlier, he's precluded from doing it again. It didn't reject the merits of our more one and more two argument. It simply said that we're precluding it from raising it under 2255 as a successor matter, and that's exactly what 2241 is designed to step in and do, that here Mr. Bourgeois' case involves this very unique and specific constellation of factors. Now, we think the fact that we're challenging the carrying out of his execution is sufficient, but this court doesn't necessarily have to agree with us on that issue to authorize 2241 review here. But we said in Perkey, we recently clarified or expanded upon what we have said in Webster and Davenport that the safety valve, in order to be able to use it, there has to be a compelling showing that as a practical matter, it would be impossible to use 2255 to cure the fundamental problem. But it's not impossible because you were able to raise that issue and present it to the Fifth Circuit. The Fifth Circuit just rejected it. Well, Your Honor, it rejected it on a procedural ground. But why does that make it impossible? Because if you, under the Fifth Circuit's formulation of 2244, any attempt to litigate an intervening change in law or fact on a categorical exemption would be kicked back if it had been previously litigated. So, for example, Mr. Webster, this court's en banc decision in Mr. Webster, the Fifth Circuit, under slightly different grounds, but rejected it on a procedural problem, procedural deficiency with 2255. That's another situation where there's a procedural barrier that prevents marriage review. And that's what's going on here. But Webster was different because there was new evidence that was available at the time. And even in dicta, the Webster court went on to say that if this were just an issue raised under the Federal Death Penalty Act, that likely wouldn't be able to bring it under the Savings Clause, which is exactly what we have here. And, Your Honor, I think the difference is, well, there are many differences. And I think fundamentally our case is more compelling than Mr. Webster's case. And that is, there was a question in Mr. Webster's case as to whether or not diligent counsel could have found that evidence. Here, there's no question that it was literally impossible for 2255 counsel to raise more 1 and more 2 in the initial 2255 proceedings because it hadn't been issued yet. It was literally impossible. If that's if that's your theory, then why aren't we looking at litigating this forever? The AAIDD, I think Dr. Swanson said, comes out with a new diagnostic manual about every 10 years or so. DSM comes out. Certainly they come out more often within the lifetime of the litigation of a capital case. And your view seems to be that this can be litigated any time and as many times as possible. Well, Your Honor, I don't think the court has to reach that issue because. That is the logic of your position. Well, my position is, one, it is it is illegal under the FDPA to execute someone who is intellectually disabled. And two, in this case, it's this unique constellation of factors that you have a 2255 court who issued a decision and employed analyses that were explicitly repudiated and rejected by more 1 and more 2. That you have a 2255 court who employed analyses that were explicitly rejected by the 2012 user's guide and the DSM-5, both of which were cited heavily and relied on in more 1. And so you have two significant intervening changes in law and fact. And the third factor here is that it is a federal death penalty case. And under the federal death penalty, there is a statutory categorical exemption on the execution of folks who are present tense intellectually disabled. So it's not a it's a very, very specific set of factors and a very, very small universe of cases and a scenario that I would submit is highly unlikely to be repeated. Scholars have looked at the history of capital crimes and what we now call intellectual disability, but what used to be called idiocy, going back to the late 18th century. And there's an argument that the Supreme Court standard today is too restrictive, that something closer to a 14-year-old's level of intellect is more consistent with the original intent of the amendment and would be roughly comparable to an IQ of, let's say, 80. If the American Psychological Association were to meet next year and say, we think that's right, and we're going to raise the threshold here to an IQ of 80, plus or minus 5, do we re-litigate all the pending intellectual disability, or in fact, most of the pending capital cases? Your Honor, I don't think it's most of the pending capital cases. I think it would have to be a federal death penalty case. It would have to be a scenario where there is a prior adjudication and that adjudication has been repudiated, legally and or factually. And the change in either standard would have to have made a difference, and here it would have made a significant difference. So this isn't a scenario where we're asking this court to make a broad ruling. We're suggesting to the court that this is a highly specific constellation of factors that, if ignored and if 2241 review is denied, would pave the way to an execution that was categorically precluded by the very language of the statute. So I don't think we're asking the court to open things up broadly. I think what we're asking the court to do is to engage in the same type of analysis that the court has engaged in in Davenport, Garza, and Webster, and to look at the facts and circumstances of this individual case. But why wouldn't it be a broad holding if we say that if a determination of intellectual disability has already been made and litigated under certain psychological medical standards, and those standards subsequently change, that then you are able to relitigate it? Why wouldn't that be a pretty big door opened for every time the medical community changes the standards? Well, and I think, Your Honor, my response is that we're not asking this court to draw the line there, that here there were no standards applied, no diagnostic standards applied at all in the 2255 proceedings. The district court identified them in 2255. The district court knew what they were and then went with, consistent with Fifth Circuit precedent at that time, the quote-unquote legal standard. And so this isn't a case where there's just a small change in a diagnostic manual. This is a case where the 2011 finding was made contrary to medical standards at that time. And so it's not a small tweak. It's unscientific determination in 2011, and now we're requesting review that is consistent with the Supreme Court precedent and the current science. Isn't that overstating what the district court did a bit, though? The judge set out the AAIDD-11 guidelines, and if you look at the analysis, I know she says legal versus medical, but if you look at the analysis, she is applying the guidelines in her 200-page opinion. Yeah, and Your Honor, I would respectfully disagree with you on that, that she cites the standards, but she engages in a number of practices that those standards say you're not supposed to do. Strengths versus weaknesses, the example I gave earlier, that's one example. Employing erroneous stereotypes regarding the intellectually disabled, that's another example. Using risk factors to rule out impairments, and risk factors are actually causes of ID. Isn't she just using some of those other factors to make credibility determinations on the competing experts? Well, Your Honor, I think both are true, and I think it more too tells us clearly that you can't make a credibility determination, or if you do, it's invalid, that if your credibility determination is made on unscientific standards and are contrary to the current diagnostic guidelines, then that credibility determination is invalid, and that's exactly what— I'm sorry. Haven't we just then let the experts decide the case? Why do it? I'm sorry? If we rely so much on the medical experts, as you're saying, what's the sense of having a district court make any decisions? Well, Your Honor, I'm not suggesting that we rely on the medical experts. I'm saying the district court should make a determination, and that determination should be made under the medical standards. And that's the distinction, that when the district court makes the determination as to whether or not a defendant is ID, that that should be made under the medical standards. And the district court is entitled to make credibility determinations, but as the Supreme Court found in Moore II, those determinations must use appropriate current diagnostic standards for the type of analysis, and that's just what the district court did not do in the 2255 proceedings. Williams, it seems to me that the scenario that you're describing here is exactly where we would be if the Supreme Court had decided expressly that Moore I and II are retroactive constitutional decisions, so that the 2255-H gateway for successive petitions would be... I mean, I'm sorry? They haven't done that, Your Honor. And that's why this is a defect in the structure of 2255, is that it does not account for people like Mr. Bourgeois, who are at the same time exempt from execution and unable to vindicate that right through 2255. In the same way that 2255 under Webster doesn't contain a place for the defendant to raise an ID determination or raise an ID challenge based on newly discovered facts. And so I see that I have five minutes, although I think, Judge Saini, did Your Honor have a question? No, you're okay. Thank you. Okay. If I'd like to briefly touch on, unless there are additional questions on the 2241 review, I'd like to just touch on the other two areas here. Just briefly, and then if it's okay with the Court, I'd like to circle back around, and if there is time. In terms of the appropriateness of the state, so the government has raised a number of arguments, one of which is timing. The government has claimed that it has an interest in proceeding with these executions right now. And what I would say in response to that is, first, there is no legitimate penological interest in executing someone who is intellectually disabled. That the FDPA expressly prohibits that, so saying that we have to proceed right now, you know, is simply invalid given the plain language of the FDPA. In terms of timing and the government's failure to proceed with an execution protocol, I think that absolutely undermines the government's position. And while the government isn't obligated to seek a protocol at any particular time, you know, I recognize that they get to choose. They then can't turn around and claim prejudice when they delay for six years and say, no, no, no, this has to go forward right now. And on the other hand, you know, we have Mr. Bourgeois, who has never had the opportunity to litigate his ID claim under diagnostic standards, current or reformed, because he has never had the opportunity to do so with the benefit of more one and more two. And so we have the risk of an invalid and unlawful execution on the one hand, and a claim for a timeliness claim that I would submit, you know, is just undermined by both the facts and the plain language of the FDPA. As to waiver, I would submit that this is, it's clearly a waiver. That waiver occurs, as I understand it, under this court's precedent, where the party has the opportunity to raise an objection, and they know they have that opportunity, and they fail to do so. And here we made two distinct claims relating to ID. One, a claim against the imposition of the death penalty, and two, a claim against the execution of that sentence. And the government failed to address that second claim. We have held, though, that with respect to waiver, that you have to intentionally or strategically waive it, not just through mistake, oversight, inadvertence. And the standard you just articulated suggests just a mistake or overlooking something would be enough for waiver, and that's not what our case law has clearly said. What evidence here is there that the government made a strategic decision or intentionally chose not to respond to the Federal Death Penalty Act claim? Oh, yes, Your Honor, because we clearly set out their omission in our reply, and the government didn't just fail to respond to the Federal Death Penalty specifically. The government failed to respond to our challenge to the carrying out of Mr. Bourgeois' death sentence. But you didn't even ask in your reply for a waiver of that argument. To say you clearly set it out is a bit of a stretch, and there was nothing, at least that I saw, saying, well, they haven't addressed this, so therefore they have waived it. Well, Your Honor, you're right. We didn't say, you know, we didn't say, Judge Magnus Stinson, we would ask that you find this to be waived, but that's not the crucial time period. That we called out their omission in the reply, they did nothing for four months, and that is the omission that Judge Magnus Stinson relied on. And moving through waiver to forfeiture— But why—how could that be sufficient for an intentional decision when you yourself aren't even asking for waiver? Well, I think the period after the reply— I understand, but you raised it—I don't—I would disagree with your characterization that you directly raised it, but it's in there toward the end in a lengthy reply. But there's nothing in terms of putting the government on notice that you're going to seek waiver, or there's a request for a waiver of that argument. So the district court found that because they didn't ask for a surreply on that, that that was evidence of intent. But if they weren't put on notice in the first instance that it could be waiver, how is that evidence of intent? Well, Your Honor, I saw that my time has run out. May I respond? You can respond, Judge Stinson. Thank you. I think the fact that they knew it was there, that they knew we had called them out on it, that's what I would submit as evidence of it. And moving through that, if this court finds that it was, in fact, a forfeiture, then consideration of forfeited issues under Woods can only be done in an exceptional case, and this isn't that. Thank you, Mr. Williams. And thank you, Your Honor. Mr. Smith? Your Honors, I would make two record points and one legal point. And other than the three points, I think that everything has been well covered in the briefs. The first record point is to the argument that this is a claim pertaining to the implementation of a sentence versus a challenge to the conviction and sentence. And I would point, Your Honors, to Petitioner's Appendix, page 78, which is the conclusion of the 2241 petition. And the relief that Mr. Bourgeois seeks is, quote, habeas relief from his convictions and sentences, including the sentence of death. That's not a implementation of the sentence claim. That's a collateral attack on the sentence. So that would be the first record point. And the second is, which I think is instructive on the waiver point, is Petitioner's Appendix, page 91. That's the conclusion of the stay motion. And the relief that he seeks in the stay motion is for the district court to grant a stay pending resolution of his Atkins claim. Now, by saying Atkins claim, I assume that Mr. Bourgeois meant to encompass the totality of his intellectual disability claim. And the same is true in the government's response to the 2241 when we use that terminology as well. I think both of those points are instructive. The final legal point that I would make is I think on the savings clause, as this court has covered, it really is controlled at this point by Perkey and Lee. Those two cases, the court's most recent cases, make clear that in order to proceed under the savings clause, there has to be some fundamental defect with 2255. There's nothing that prevented Mr. Bourgeois from raising these arguments that he has now about the district court's application of the intellectual disability standard in his 2255. He did present the arguments in district court. He chose not to appeal them. And especially in the FDPA context, there is absolutely nothing that would have prevented him from advancing those arguments to the Fifth Circuit in his 2255. Therefore, the problem that Mr. Bourgeois has is not a fundamental defect with 2255. It's simply both that the Supreme Court has not declared the more decisions to be retroactive and also that the district court's analysis is still consistent with those decisions and the contemporary diagnostic standards as it employed in its lengthy analysis following its substantial evidentiary hearing on this issue. Your Honors, if the court has no further questions, I would just ask that the court please be cognizant of the public interest in moving this case along. And the government would ask that the court consider expeditiously lifting this day and potentially issuing the mandate forthwith with the opinion. And we thank the government. The government thanks the court for its time in this case. And we would ask you to vacate this day. Thank you. Thank you, Mr. Smith. Thanks to both counsel. And the case is taken under advisement and the court will be in recess.